UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WILLIAM A. HOLIFIELD                          CIVIL ACTION

VERSUS                                        NUMBER: 07-7702

MICHAEL J. ASTRUE,                            SECTION: "A"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), presently before the Court are the parties' briefs following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 18, 19).

William A. Holifield, plaintiff herein, filed the subject applications for DIB and SSI benefits on July 10, 2002, alleging disability as of April 30, 2002. (Tr. pp. 46-48, 49). In a Disability Report completed on June 9, 2002, plaintiff identified

numbness in the leg and shoulder and left leg weakness as the conditions resulting in his inability to work. (Tr. pp. 53-62). Plaintiff's applications for DIB and SSI benefits were denied at the initial step of the Commissioner's administrative review process on August 12, 2002, (Tr. pp. 28-31). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on October 2 and 8, 2003 at which plaintiff, who was represented by counsel, and a Medical Expert ("ME") appeared and testified. (Tr. pp. 32-33, 135-146, 147-170). On December 18, 2003, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 10-18). On October 6, 2004, the Appeals Council ("AC") denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 3-6).

Having thus exhausted his administrative remedies, plaintiff then filed suit in this court seeking judicial review of the Commissioner's adverse decision denying him Social Security benefits. See Holifield v. Barnhart, 04-CV-3287 "A"(4). In due course, the defendant filed an unopposed motion to reverse the decision of the Commissioner and to remand plaintiff's case back to the Administration for further proceedings which was granted on June 14, 2005. (04-CV-3287, rec. docs. 17, 18). Following that

remand, the AC formally vacated its earlier decision denying DIB and SSI benefits and sent plaintiff's case back to the ALJ for further consideration. (Tr. pp. 203-205). After the record was developed further, a second hearing before a different ALJ went forward on February 12, 2007 at which plaintiff, who was again represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 215-236). On March 15, 2007, the second ALJ issued a written decision in which he also concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 175-188). On September 1, 2007, the AC declined to assume jurisdiction over plaintiff's case, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 171-174). It is from that unfavorable decision that the plaintiff again seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In the brief supporting his request for judicial review, plaintiff presents the following issues for resolution:

1.  [t]he decision substitutes the ALJ's medical opinion for that of the treating orthopedic surgeon as to plaintiff's residual functional capacity (RFC), without any medical opinion to support his determination. Was this error?

2.  [t]he decision rejects the findings of the treating orthopedic surgeon as to the plaintiff's eligibility under 20 CFR 404, subpt. P, App. 1 (pt. A) Listing 1.04A based on the opinion of a non-treating, non-examining physician. Was this error?

3.  [t]he decision rejects the findings of the treating orthopedic surgeon without the ALJ recontacting him to

attempt to resolve perceived discrepancies. Was this error?

4.   [t]he decision rejects the findings of the treating orthopedic surgeon without evaluating the factors of 20 C.F.R. 404.1527(d)(2). Was this error?

5.   [t]he decision gives no weight whatever to the findings of the treating orthopedic surgeon. Was this error?

(Rec. doc. 18, pp. 1-2).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.   [t]he claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2.   [t]he claimant's statements to health care providers and his reported earnings indicate that the claimant has worked after April 30, 2002, the alleged onset date; however, he testified the has not worked since the alleged onset date. (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.   [t]he claimant has the following severe impairments: a back disorder; and a history of tendonitis/bursitis of the shoulders, imposing more than slight limitations on the claimant's ability to engage in work-related activities. (20 CFR 404.1520(c) and 416.920(c)).

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry and push and/or pull 50 pounds occasionally and 25 pounds frequently; to sit for a total of 6 hours in an 8-hour day; and to stand and/or walk for a combined total of 6 hours in an 8-hour

day; but should avoid frequently climbing ladders, ropes
and scaffolds or working at unprotected heights. The
claimant retains the ability to perform the requirements
of detailed but not highly complex work; to interact
successfully with co-workers and supervisors; and to
concentrate for extended periods of time and complete
tasks in a timely manner.

6.      [t]he claimant is capable of performing past relevant
        work as a truck driver. This work does not require the
        performance of work-related activities precluded by the
        claimant's residual functional capacity (20 CFR 404.1565
        and 416.965).

7.      [t]he claimant has not been under a disability, as
        defined in the Social Security Act, from April 30, 2002
        through the date of this decision (20 CFR 404.1520(f) and
        416.920(f)).

                                        (Tr. p. 185, 187, 188).

Judicial review of the Commissioner's decision to deny DIB or

SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:

(1) whether substantial evidence of record supports the

Commissioner's decision, and (2) whether the decision comports with

relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292

(5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir.

1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the

Commissioner's findings are supported by substantial evidence, they

are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson

v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no

substantial evidence is appropriate only if no credible evidentiary

choices or medical findings exist to support the Commissioner's

decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. <u>Harrell</u>, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set

forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work "... may

rest on descriptions of past work as actually performed or as generally performed in the national economy." <u>Villa</u>, 895 F.2d at 1022 (citing <u>Jones v. Bowen</u>, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987).

As noted in the procedural history set forth above, the first of the two hearings that plaintiff had before an ALJ occurred over a span of two days in October of 2003. On the first day of that hearing, the ALJ questioned what he perceived to be inconsistencies between the treatment notes of plaintiff's orthopedist, Dr. Thomas Purser, and checklist forms the doctor had completed at the behest of counsel which embraced plaintiff's symptoms and capabilities. Options to resolve those inconsistencies included sending plaintiff for a consultative evaluation by a neurologist, recontacting Dr. Purser, or utilizing the services of a ME. After a lengthy discussion with counsel, the ALJ decided to continue the hearing to a later date to allow a ME to review plaintiff's file and to offer testimony as to its consistency. After that decision was made, plaintiff stated on the record that he had suffered from nerve damage since 1974 and had declined surgery after a myelogram revealed two ruptured discs. Plaintiff complained of sexual

dysfunction, a lack of sensation in the hips, and left leg weakness that was so great that he could hardly walk on it at times. Plaintiff also questioned the accuracy of the nerve conduction studies that had been performed. (Tr. pp. 135-146).

The hearing was subsequently reconvened on October 8, 2003 with a ME in attendance, Dr. Leon Weisberg, Chief of the Neurology Department at the Tulane University Medical Center. When asked by the ALJ what, if any, severe medically determinable impairments were apparent from a review of plaintiff's file Dr. Weisberg answered that there were none. He further testified that there was no evidence of nerve root compression and no objective findings of muscle weakness, sensory or reflex loss, or positive straight leg raising. In Dr. Weisberg's opinion, the MRI's that had been performed did not reveal nerve root compression and the EMG showed no abnormalities. In the absence of motor/reflex/sensory abnormalities, a diagnosis of nerve root compression as had been indicated by Dr. Purser was not possible. Dr. Weisberg was unable to point to any objective evidence establishing a limitation of motion to plaintiff's spine. X-rays taken the week before the reconvened hearing showed well-maintained disc spaces, no fractures, and nothing supporting symptoms of nerve root compression. (Tr. pp. 147-154).

Upon being tendered to plaintiff's counsel for questioning,

Dr. Weisberg was directed back to the recent x-rays which contained a finding of calcification in the abdominal aorta but the doctor testified that said finding had nothing to do with nerve root compression or issues involving the spine. Counsel then turned his attention to EMG test results from July 23, 2002 which had been characterized as an "incomplete study". Dr. Weisberg testified, however, that the incomplete nature of the study did not invalidate the results that had been obtained which included normal findings for the distal left lower extremity but none with respect to the right leg secondary to plaintiff's tolerance for the procedure. The doctor further noted that nerve conduction and F-wave studies of both legs were entirely normal. (Tr. pp. 154-158).

The ALJ, plaintiff's counsel, and the ME then tried to decipher one of Dr. Purser's treatment notes which was largely illegible. An August 16, 2002 note from the Slidell Chiropractic Clinic did include an indication of positive straight leg raising at twenty degrees bilaterally with decreased lumbar spine range of motion. In answer to counsel's further questioning, Dr. Weisberg testified that minimal disc bulging cannot cause significant limitations of function and significant pain; such functional limitations and pain are only present when there is nerve root impingement and disc herniation is not synonymous with disc bulging. The doctor also testified that the radiological findings

were inconsistent with positive straight leg raising or sciatica but negative EMG and nerve conduction studies did not preclude the presence of radiculopathy which could be found via a sensory exam. Finally, contrary to what had been reported on the first day of the hearing, counsel advised the ALJ that he had not referred plaintiff to Dr. Purser. (Tr. pp. 158-167).

At this point in the hearing, plaintiff felt compelled to address the ALJ directly even though he had not yet been sworn as a witness. Plaintiff stated that he suffered from serious nerve problems and that his "... sciatic nerve hits me and knocks me to the ground." On such occasions, plaintiff relied upon his son to literally pick him up and carry him to bed where he remained unable to function or to walk again for two to three hours. Plaintiff indicated that he was unable to walk for more than five minutes or on concrete surfaces, that his hip felt like it was ripping in two, and that numbness was worse with walking. At bedtime, plaintiff's legs jerked for anywhere from ten minutes to an hour before he was able to settle down and sleep for one to two hours. After several nights of such limited sleep, plaintiff would become so fatigued that he would then sleep a full five hours. Plaintiff complained that his lower extremities and groin were "dead" and that his left hand became so sore at times that a mere touch felt like it was being stuck with a needle. Regardless of the test results,

plaintiff stated that he was simply unable to function at the level that he used to.   Ultimately, plaintiff was sworn in and he testified that his previous statements to the ALJ had been truthful.   When asked by counsel whether plaintiff's testimony was inconsistent with the objective test findings, Dr. Weisberg testified that he did not doubt plaintiff's veracity but that the record did not offer objective support for plaintiff's subjective complaints. (Tr. pp. 167-169).

At the time of the second administrative hearing that was held on February 12, 2007, plaintiff was fifty-five years of age, had completed eight years of formal education, and had past relevant work experience as truck driver with a commercial driver's license. Despite having a personal driver's license, plaintiff testified that he had not driven for a period of years.   Plaintiff lived in a house with his wife and disabled son and spent his time lying down, watching TV, and occasionally taking a short walk.   He had problems using the stairs and reportedly needed assistance in getting into and out of the bathtub.

In terms of physical problems, plaintiff complained of sciatic nerve pain on the left which started in the hip and radiated downwards.   Three to four times per year, the pain was so intense that it literally knocked plaintiff off of his feet.   Plaintiff also suffered from leg spasms at night, worse on the left, left leg

numbness from the hip to the knee, and constant hip pain, worse with activity such that he could not walk for more than three to five minutes before needing to sit. Plaintiff performed no household chores and did no grocery shopping. He estimated that he could only be on his feet for ten to fifteen minutes at a time, could sit for only fifteen minutes, and could possibly lift a gallon of water. Plaintiff was unable to raise his hands above his head, had pain between his shoulders, had numbness in his left hand, had recently been diagnosed as having arthritis in the left shoulder, and had diminished hand strength. Various postural maneuvers could not be performed and plaintiff also suffered from hypertension in addition to taking Effexor for depression which had been prescribed by his primary care physician. (Tr. pp. 218-226).

Crystal Younger, a VE, was next to take the stand. After her qualifications were stipulated to, the ALJ posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was capable of lifting fifty pounds occasionally, twenty-five pounds frequently; who was limited in balancing activities as well as in climbing ladders, ropes, scaffolds, and working in unprotected heights; who could stand and/or walk for six hours per eight-hour workday; who could understand and carry out detailed but not complicated job instructions; and, could deal appropriately with others in a

workplace setting.  In answer thereto, the VE testified that the individual described in the hypothetical question could perform plaintiff's past medium-level work as a truck driver. (Tr. pp. 227-228).

To the hypothetical question as originally framed, the ALJ reduced the maximum lifting/carrying capability to twenty pounds occasionally and ten pounds frequently and then queried the VE on whether plaintiff had skills that were transferable to other driving positions.  The VE then testified to the existence of various other light-level, semi-skilled driving jobs (vending machine coin collector and passenger bus driver) and light-level unskilled driver and courier jobs.  However, if the individual missed two days of work per month or needed excessive breaks during the day for whatever reason, employability would be difficult to maintain.  An inability to stand, walk, and/or sit for six hours per eight-hour workday would also render the individual unemployable. (Tr. pp. 228-235). Upon being tendered to plaintiff's counsel for further questioning, the VE was asked whether limited use of the left arm would preclude performance of the previously-identified driving jobs. Although the VE was aware of situations in which a modified vehicle was utilized, in a traditional workforce without such an accommodation the ability to drive would indeed be hindered.  Counsel then began to delve into what effect plaintiff's

anti-depressant had on his ability to drive but then abruptly concluded his questioning. (Tr. pp. 235-236).

The documentary evidence admitted in the administrative proceedings below begins with a treatment note from Dr. Miguel Culasso of the Instant Care Family Medical Center dated June 24, 2002. At that time, plaintiff was evaluated for complaints of bilateral shoulder, left hip, and low back pain and left leg numbness after falling off a truck two weeks earlier. His past medical history was said to include shoulder, hip, and back pain as well as arthritis since the 1970's. The diagnosis was lumbar radiculopathy and plaintiff was scheduled for an MRI. (Tr. p. 85). Plaintiff subsequently underwent a lumbar spine MRI without contrast at the Slidell Memorial Hospital on June 27, 2002. That test revealed minimal central bulging of the L5-S1 disc margin, degenerative changes at L2-3 through L5-S1, and minor encroachment of the central canal posteriorly at the L3-4 and L4-5 levels. (Tr. pp. 87-88). Plaintiff returned to Dr. Culasso to obtain the results of the MRI on July 2, 2002 and was prescribed physical therapy at a rate of three times per week. (Tr. pp. 83-84).

On July 21, 2002, plaintiff completed the Administration's Disability Supplemental Interview Outline form which elicited information about his activities. There, plaintiff reported that he could tend to his own personal hygiene needs but that he had

stopped preparing his own meals, performed no household maintenance, did no shopping, had no hobbies or social contacts, and was unable to drive, all secondary to pain caused by his condition. (Tr. pp. 67-72).

On July 23, 2002, plaintiff underwent an EMG and nerve conduction studies of both legs. The latter study and F wave study was normal as to both legs as was the EMG of the left lower extremity. However, plaintiff could not tolerate further EMG testing of the right lower extremity and the study was thus characterized as "incomplete". (Tr. pp. 81-82). As was noted earlier, the ME would later testify at the October 2003 administrative hearing that the incomplete nature of the study did not invalidate the results that had been obtained. (Tr. p. 156).

On August 9, 2002, an Administration medical consultant reviewed plaintiff's file and thereafter completed a Residual Functional Capacity Assessment form which elicited his opinions on plaintiff's capabilities. There, the consultant opined that plaintiff's impairment was non-severe and that plaintiff was only partially credible as he did suffer from some mild degenerative changes but that his symptoms were disproportionate to the objective findings. (Tr. pp. 89-96).

Plaintiff was next seen at the Slidell Chiropractic Clinic on August 16, 2002 for complaints of shoulder, back, and leg pain in

connection with his fall. Plaintiff advised medical personnel that his condition initially began troubling him in February of 1974 but that it had worsened over the previous four to six months and was most problematic when lying down. Lower back and radicular pain of unspecified onset was noted and plaintiff characterized the pain to his left leg as a "10" on a scale of 1 to 10. The chiropractic treatment note contains a positive finding of straight leg raising at 20 degrees bilaterally, a reduced range of motion to the lumbar spine, and extreme L5-S1 tenderness with bilateral sciatica. X-rays were indicative of discopathy at L4-S1 and L5-S1, foramental stenosis at L5-S1, and lateral disc wedging at L4-L5 and L5-S1. The plan was to administer moist heat, intersegmental traction, and passive manipulation three times per week with a repeat MRI to be obtained if no improvement was obtained after four to six visits. (Tr. pp. 130-134).

The next treatment note documents plaintiff's evaluation by Dr. Thomas Purser of The Orthopedic Clinic in Picayune, Mississippi on October 9, 2002. Plaintiff's major complaint was described as a 1974 on-the-job injury to his low back with pain in the lumbosacral and cervical spines and radiculopathy to both legs and shoulders. The doctor noted that plaintiff was a dump truck owner and driver who had applied for Social Security benefits. Although difficult to decipher, it appears that Dr. Purser interpreted the

earlier MRI results as demonstrating the appearance of a disc lesion at L5-S1. Straight let raising was negative on the left. The clinical diagnosis with respect to the lumbosacral spine appears to be nerve root compression at L4-S1 on the left and, for the cervical spine, nerve root impingement at C5-C6 on the left. Medications were prescribed including Vioxx. (Tr. pp. 103-105).

Plaintiff returned to Dr. Purser on October 18, 2002 and the note from that date contains a notation of nerve root compression at L4-5 but some relief to the shoulders was reported with Vioxx. (Tr. p. 102). The next treatment note from Dr. Purser dated October 24, 2002 is less than readable. (Id.). By November 19, 2002, an open MRI had been scheduled. (Id.). That test was ultimately performed on December 20, 2002. (Tr. pp. 100-101). The study of the cervical spine revealed degenerative changes with no neural compressive disc disease and mild foraminal encroachment at multiple levels secondary to facet pathology. (Tr. p. 100). A similar study of the thoracic spine demonstrated mild scoliosis and degenerative spondylosis but no neural compressive disc disease. (Tr. p. 101). Plaintiff obtained the MRI results from Dr. Purser on January 2, 2003 and medication was prescribed. (Tr. p. 102).

On January 7, 2003, Dr. Purser completed a "To Whom It May Concern" checklist-type form that had been provided to him by plaintiff's attorney. There, the doctor checked off the

appropriate boxes on the form to indicate that plaintiff suffered from compromise of a nerve root or the spinal cord characterized by neuro-anatomic distribution of pain, limitation of motion in the spine, muscle weakness, sensory and reflex loss, and positive straight leg raising in both the sitting and supine positions. Dr. Purser checked off additional boxes on the form to state that plaintiff's complaints of the following <u>were not</u> true and correct: an exacerbation of his back pain after standing/walking for fifteen to thirty minutes; cervical pain upon looking down for extended periods; and, episodes of pain and numbness in the left shoulder on an average of at least once or twice per month which ordinarily persisted for two days to a week and during which use of the left arm was significantly impaired. The doctor further indicated that plaintiff was unable to lift and/or carry ten pounds for two hours out of an eight-hour day, was unable to stand and/or walk for that same time period, and was unable to sit for six hours out of an eight-hour day. (Tr. pp. 98-99).

On January 27, 2003, plaintiff was seen again by Dr. Culasso following an allergic reaction to blood pressure medication. (Tr. p. 125). Plaintiff's hypertension was monitored again on February 4, 2003 and he complained of weakness. (Tr. p. 124). Further monitoring by Dr. Culasso occurred on February 18, 2003. (Tr. p. 123). Plaintiff was next seen by Dr. Purser on April 4, 2003 with

complaints of pain to the left hip and right shoulder that were increasing in severity. The note from that date appears to contain a notation of nerve root compression at C6 on the left. No treatment plan was given. (Tr. p. 102). On that same date, Dr. Purser completed another "To Whom It May Concern" form from plaintiff's attorney that was identical to the one he had completed three months earlier. This time, however, the doctor checked off the appropriate boxes on the form to indicate that plaintiff was credible with respect to complaints of experiencing an exacerbation of his back pain after standing/walking for fifteen to thirty minutes, cervical pain after looking down for extended periods, and persistent episodes of pain and numbness in the left shoulder. (Tr. pp. 126-127).

Plaintiff complained of itching related to his drug reaction when he was next seen by Dr. Culasso on April 14, 2003. (Tr. p. 122). Further monitoring of plaintiff's hypertension and its management went forward on April 22, 2003. (Tr. p. 121). A fracture/contusion of the left little finger was treated on May 6, 2003. (Tr. pp. 120, 129). Plaintiff returned to Dr. Culasso on May 30, 2003 to have staples removed after hitting his head ten days earlier and receiving emergency treatment at the Northshore Regional Medical Center. (Tr. p. 118). Following complaints of arm pain and parethesias of both arms and hands, plaintiff underwent

nerve conduction studies of those areas on June 17, 2003 which produced normal results. (Tr. p. 117). A sore throat and fever were treated by Dr. Culasso on June 20, 2003. (Tr. p. 116).

On October 2, 2003, x-rays of plaintiff's lumbosacral spine were taken at the request of one Dr. Hernandez following complaints of pain. That study revealed well-maintained disc spaces with no evidence of fracture. (Tr. p. 129). On that same date, plaintiff identified his medications as including Vioxx for pain, prescribed by Dr. Purser, and Vicoprofen, Celexa, Cardizem, and Prinibale, prescribed by Dr. Culasso. (Tr. pp. 77-78). Also on October 2, 2003, plaintiff's counsel completed and provided the Administration with its pre-printed questionnaire in which he indicated that plaintiff's condition satisfied the criteria of Section 1.04(A) of the Listing of Impairments based on the "To Whom It May Concern" form that had been completed by Dr. Purser. Counsel further indicated that plaintiff was disabled under Rule 201.10 of the Medical Vocational Guidelines; could frequently lift/carry less than ten pounds; could stand and/or walk for less than two hours out of an eight-hour workday; could sit for less than six hours per eight-hour workday; was limited in the ability to push/pull with both the upper and lower extremities; and, was functionally limited by non-exertional impairments of pain and headaches, all based on the form Dr. Purser had completed. (Tr. p. 79).

The next clinic note was not generated until July 22, 2004 when plaintiff was evaluated by Dr. Brian Fong.  Plaintiff's chief complaint at the time was low back pain which had started three years earlier when he fell off of a truck.  He experienced sciatica when he sat or twisted as well as numbness to the groin if he sat on the toilet for more than three minutes.  Plaintiff related to Dr. Fong his earlier fall in 1972 and the fact that the symptoms associated with that incident had resolved within a few years.  However, plaintiff's condition had worsened and he advised Dr. Fong that he had thus applied for Social Security benefits.  His occupation was listed a truck driver.

At the time of his evaluation by Dr. Fong, plaintiff complained of bilateral arm and leg swelling with the right shoulder hurting more than the left at night.  Plaintiff's past medical history was notable for depression, rheumatoid arthritis, low back pain, neck pain, and high blood pressure and his medications consisted only of an anti-depressant.  On physical examination, plaintiff had a full range of motion to the right shoulder but impingement was present and the supraspinatus was tender but strength was intact.  Plaintiff's left shoulder was less tender with a full range of motion, positive impingement, and with a tender supraspinatus.  Straight leg raising was negative, the hip range of motion was full and non-tender, and reflexes were intact.

Plaintiff did have tenderness over the bilateral trochanters which constituted the chief complaint. The impression was bilateral rotator cuff tendonitis and bilateral trochanteric bursitis. While part of the doctor's note was rendered illegible in the process of being photocopied, it appears that the treatment plan consisted of a series of injections which could not be given all on the same day and a course of oral steroids. (Tr. pp. 213-214).

The final treatment note appearing in the record documents plaintiff's return to Dr. Purser on August 22, 2005 in connection with a motor vehicle accident that occurred on July 27, 2005. Like many of Dr. Purser's records, the note is largely illegible but it appears that plaintiff underwent physical therapy and was given medication including pain pills. Plaintiff's other medications at the time were listed only as Effexor. (Tr. pp. 210-212).

As was mentioned earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on five grounds. Before turning to those specific challenges, the Court notes that when plaintiff's applications for DIB and SSI benefits were initially denied in December of 2003, the ALJ had found that plaintiff did not suffer from a severe impairment, thus concluding his analysis at the second step of the Commissioner's five-step review process. (Tr. p. 18). Given the disfavor with which such second-step denials are viewed in the Fifth Circuit, Anthony, 954

F.2d at 293-94, it is indeed understandable that the government would agree to a remand of plaintiff's previous lawsuit here, 04-CV-3287.

Plaintiff's first challenge to the Commissioner's decision is that the ALJ improperly substituted his opinion for that of plaintiff's treating orthopedic surgeon, Dr. Purser, regarding plaintiff's residual functional capacity ("RFC") to work. In support of that challenge, plaintiff points to the limitations he self-reported in the Administration's Disability Supplemental Interview Outline form; diagnoses of lumbar radiculopathy by Dr. Culasso on June 24 and July 2, 2002; MRI test results from June 27, 2002; chiropractic treatment notes from August 16, 2002; medical records generated by Dr. Purser following an office visit on October 9, 2002; and, the "To Whom It May Concern" form completed by Dr. Purser on January 7, 2003. (Rec. doc. 18, pp. 3-4). Plaintiff additionally cites a portion of the ME's testimony from October 8, 2003 in support of the proposition that the limitations and subjective complaints that plaintiff testified to should be fully credited. The full, complete exchange between plaintiff's counsel and the ME is as follows:

ATTY2:    Okay. Dr. Weisberg, is the testimony that you just heard inconsistent with any of the findings that you have reviewed?

ME:       Sir, I have no doubt of the patient's symptoms and

24

<pre>
                    the voracity (sic) of his symptoms.  I don't doubt
                    him them (sic) in any way.

ATTY2:      Okay.

ME:         I don't have enough medical evidence to go any
            further.
</pre>

                                        (Tr. p. 169).

Consistent with the bulk of the ME's hearing testimony, the ALJ would later interpret the above-quoted exchange as follows:

> ... Dr. Weisberg, the expert in neurological medicine, testified that he did not doubt the claimant's veracity. However, he had also reviewed the claimant's medical treatment evidence and had found no objective evidence on which to make any diagnosis or make any findings of medically determinable severe impairments.

                                        (Tr. p. 183).

The ALJ's interpretation was a correct one as the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989).

As will be discussed more fully <u>infra</u>, at the third step of the five-step analysis under §§404.1520 and 416.920 the ALJ properly found that plaintiff's condition did not satisfy the criteria of any of those set forth in the Listing of Impairments. Having reached that conclusion, the Regulations mandated that the

ALJ make an assessment of plaintiff's RFC which is defined as what the claimant can still do in spite of his limitations. 20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), and 416.945. Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining an individual's RFC lies with the ALJ. 20 C.F.R. §§404.1527(e)(1), (f)(2), 404.1546, 416.927(e)(1), (f)(2), and 416.946. Assessments of an individual's RFC like the one done by the ALJ in plaintiff's case are not medical opinions at all. Joseph-Jack v. Barnhart, 80 Fed.Appx. 317, 318 (5th Cir. 2003).

As for the other documentary evidence relied upon by plaintiff, self-reported limitations provided by a claimant must be supported by other competent, objective medical evidence to be accepted as credible. Selders, 914 F.2d at 618. While it is true that Dr. Culasso rendered a diagnosis of lumbar radiculopathy on two occasions, only a three-week course of physical therapy was prescribed. Moreover, the mere fact that said diagnosis was made or that plaintiff experienced pain or other symptoms that limit the activities that he can engage in does not, in and of itself, compel the conclusion that he is disabled within the meaning of the Social Security Act. Harrell, 862 F.2d at 480; Chaparro, 815 F.2d at 1010 (citing Jones, 702 F.2d at 622-24). The MRI test results from June 27, 2002 revealed only minimal bulging of the L5-S1 disc margin,

degenerative changes at various levels, and minor encroachment of the cervical canal at L3-4 and L4-5. As noted, only physical therapy was prescribed as a result of the MRI findings and the ME would later testify that significant functional limitations and pain do not occur absent nerve root impingement, of which there was no evidence. And, because chiropractors are not acceptable medical sources under 20 C.F.R. §§404.1513(a) and 416.913(a), the records from the Slidell Chiropractic Clinic are entitled to little weight here.

Finally, plaintiff relies on the first of the two "To Whom It May Concern" forms that Dr. Purser completed. Putting aside the fact that the January 7, 2003 questionnaire was unaccompanied by any contemporaneously-recorded, medically acceptable findings and is thus entitled to little weight on this basis alone, Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980), a close reading of the form reveals that the doctor checked off boxes, perhaps in error, indicating that he found the five categories of enumerated subjective complaints voiced by plaintiff not to be true and correct. (Tr. p. 98).

In his second challenge to the Commissioner's decision, plaintiff alleges that the ALJ, based solely on the testimony of the ME, rejected the opinion of Dr. Purser as to whether plaintiff's condition satisfied the criteria of Section 1.04(A) of

the Listing of Impairments. That section provides that an individual will be deemed to be disabled if he suffers from:

> 1.04 *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Plaintiff argues that Dr. Purser found that he satisfied all of the criteria of Section 1.04(A). The findings to which plaintiff refers are the two questionnaire forms that the doctor completed on January 7 and April 4, 2003. Those forms, as noted above, contain no supportive, objective findings and are thus entitled to little persuasive weight. <u>Warncke</u>, 619 F.2d at 417. Plaintiff further argues that "[t]he ALJ employed the ME not to address the findings of Dr. Purser as to RFC, but rather as to his findings as to nerve root compression and the other criteria of Listing 1.04A." (Rec. doc. 18, p. 8). Title 20 C.F.R. §§404.1527(f)(2)(iii) and 416.927(f)(2)(iii) specifically authorize an ALJ to "... consider opinions from medical experts on the nature

28

and severity of ... [a claimant's] impairment(s) and on whether ...
[those] impairment(s) equals the requirements of any impairment
listed in appendix 1 to this subpart", (i.e., the Listing of
Impairments).  Counsel having argued that plaintiff's condition
satisfied Section 1.04(A), it was entirely appropriate for the ME
to testify as to whether the criteria of the listing was met.  On
that score, neither the physician who performed the first MRI on
June 27, 2002 nor Dr. Culasso who interpreted and provided the
results of the MRI on July 2, 2002 made any mention of nerve root
compression.  Only physical therapy was prescribed in the face of
the MRI findings and Dr. Culasso did not advise plaintiff to limit
his activities in any way.  The ME would later testify that the
results of the EMG and nerve conduction studies that were performed
on July 23, 2002 were inconsistent with nerve root compression.

Contrary to the opinions of the radiologist and Dr. Culasso,
Dr. Purser apparently reinterpreted the first MRI test results as
demonstrating nerve root compression. Dr. Purser then referred
plaintiff for an open MRI.  That test was performed on December 20,
2002 and the evaluating physician specifically found no evidence of
neural compressive disc disease.  Plaintiff obtained the second MRI
test results on January 2, 2003.  Contrary to the objective
findings revealed through both of the MRI's, Dr. Purser completed
his first "To Whom It May Concern" letter on January 7, 2003

wherein he indicated that nerve root compression was present. However, the doctor also indicated on the form, perhaps erroneously, that he gave no credence to the subjective limitations plaintiff had reported. Plaintiff would subsequently see Dr. Purser on only two more occasions. On the first such occasion, April 4, 2003, plaintiff complained of increased pain to the left hip and right shoulder but no treatment plan is apparent. Plaintiff saw Dr. Purser a second time on August 22, 2005 following a motor vehicle accident one month earlier. Plaintiffs' medication at this time consisted only of Effexor for depression and he was simply prescribed physical therapy and pain medication for his condition. In the interim, plaintiff had undergone nerve conduction studies of the upper extremities, which were normal, and x-rays of the lumbar spine which showed well-maintained disc spaces, the latter of which Dr. Weisberg would testify simply did not support a finding of nerve root compression. Straight leg raising tests conducted by Dr. Fong on July 22, 2004 were negative and plaintiff was prescribed only injections and oral steroids. Evidence of positive straight leg raising in both the sitting and supine positions as required by Section 1.04(A) is absent from the record.

The ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion.

Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)(quoting Paul v.
Shalala, 29 F.3d 208, 211 (5th Cir. 1994), overruled in part on
other grounds by Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080
(2000)).  A treating physician's opinions are not conclusive and
may be assigned little or no weight when good cause  is shown.
Newton, 209 F.3d at 456 (citing Brown v. Apfel, 192 F.3d 492, 500
(5th Cir. 1999) and Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir.
1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984 (1995)).  Good
cause exists when the treating physician's opinions are so brief
and conclusory that they lack persuasive weight, when they are not
supported by medically acceptable techniques, or when the evidence
supports a different conclusion.  Newton, 209 F.3d at 456; Martinez
v. Chater, 64 F.3d 172, 176 (5th Cir. 1995); Bradley v. Bowen, 809
F.2d 1054, 1057 (5th Cir. 1987); Scott v. Heckler, 770 F.2d 482, 485
(5th Cir. 1985).

     Contrary to plaintiff's present assertion, the ALJ did not
reject the objectively-unsupported opinions of Dr. Purser based
solely on the testimony of the ME. The ME, the Court recalls,
testified that even the existence of a severe impairment was not
apparent based on a review of plaintiff's medical records and he
gave no testimony as to whether the criteria of Section 1.04(A) had
been met or not.  A fair reading of the ALJ's opinion readily
establishes that the he gave diminished weight to Dr. Purser's

opinions after duly concluding all of the evidence before him, including the treatment records of Dr. Culasso and Dr. Fong.

Plaintiff's third challenge to the Commissioner's decision is that the ALJ rejected the opinions of Dr. Purser without first recontacting him in an attempt to resolve the perceived discrepancies.

In Newton, 209 F.3d at 453, the Fifth Circuit held that "if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. §404.1512(e)." (Emphasis added). As noted earlier, because the record in the present case contains other medical opinion evidence based on personal examination and treatment of plaintiff in the form of the clinic notes of Doctors Culasso and Fong, Newton does not require that the ALJ recontact Dr. Purser. Williams v. Astrue, 2008 WL 2397702 at *10 (E.D. La. 2008).

In addition, the Court recalls that contrary to the opinions of the doctors who actually performed and interpreted the results of the first MRI, Dr. Purser opined that nerve root compression was present. The doctor sent plaintiff for a second MRI which again failed to produce objective results supporting a finding of nerve

root compression yet the doctor continued to advance that diagnosis. The burden is upon the claimant to furnish the medical and other evidence necessary to prove up his disability, 20 C.F.R. §§404.1512(a) and 416.912(a), and the Regulations allow the Commissioner to make a decision on a claimant's entitlement to Social Security benefits even where the evidence before him is inconsistent. 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2). Morever, unlike the situation presented in <u>Hall v. Astrue</u>, 2008 WL 4831706 (E.D. La. Nov. 6, 2003), the ALJ in the present case noticed the inconsistencies in Dr. Purser's records early on in the proceedings, invited plaintiff's counsel to secure the doctor's presence to testify presumably pursuant to a subpoena, 20 C.F.R. §§404.951(d) and 416.1450(d), and with the acquiescence of counsel utilized the services of an ME in an effort to resolve any ambiguities. This claim is rejected.

In his fourth challenge to the Commissioner's decision, plaintiff alleges that the ALJ erred in failing to accord controlling weight to Dr. Purser's opinions without evaluating the factors in 20 C.F.R. §§404.1527(d) and 416.927(d). The Court need not pause long over this challenge as the Regulations require the ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in §§404.1527(d) and 416.927(d) <u>only</u> in the absence of controverting medical evidence from other

treating and/or examining physicians. <u>Newton</u>, 209 F.3d at 453. In light of the medical opinions from Doctors Culasso and Fong, the ALJ was under no obligation to perform the analysis in question to the extent that he did not.

Plaintiff's fifth and final challenge to the Commissioner's decision is that the ALJ violated the precepts of <u>Newton</u> by giving no weight to the opinions of Dr. Purser. As demonstrated above, unlike the claimant in <u>Newton</u>, plaintiff's applications for Social Security benefits were not denied based solely on the opinions of a non-examining, non-treating medical expert but on a thoughtful consideration of all of the evidence, including the findings of the radiologists who performed the diagnostic tests on plaintiff and the opinions of Dr. Culasso and Fong. In any event, the ALJ gave Dr. Purser's opinions little weight, not no weight. (Tr. p. 187).

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is recommended that the decision of the Commissioner of the Social Security Administration denying plaintiff's application for Social Security benefits be affirmed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual

findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this <u>10th</u> day of <u>   July   </u>, 2009.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE